COMMERCIAL CREDIT EQUIPMENT CORPORATION, a Delaware corporation, Plaintiff–Appellant,

v.

Marion J. STAMPS, Defendant–Appellee.

No. 89–1592.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1990.

Decided Dec. 27, 1990.

Edwin H. Conger, Edward Eshoo, Jr., Tenney & Bentley, Chicago, Ill., Dennis R. Spirgen, Commercial Credit Equipment Corp., Associate Gen. Counsel, New York City, for plaintiff-appellant.

Jerome H. Torshen, Abigail K. Spreyer, Mark K. Schoenfield, Torshen, Schoenfield & Spreyer, Chicago, Ill., for defendant-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and SHARP,* District Judge.

COFFEY, Circuit Judge.

In accordance with a jury verdict, the district court entered judgment against Commercial Credit Equipment Corporation (CCEC) on its complaint, which sought a declaratory judgment that Marion J. Stamps was liable for the balance due on a commercial loan; the court entered judgment in favor of Stamps on his counterclaim, awarding actual and punitive damages for fraud and conversion. The district judge subsequently entered an order approving Stamp's bill of costs (including fees for videotaped depositions and transcripts thereof) and prejudgment interest on the compensatory damages as well as an order denying CCEC's motion for judgment notwithstanding the verdict or for a new trial. CCEC appeals the judgment. We affirm the district court's award of compensatory damages as well as part of the costs, reverse on the issues of punitive damages, prejudgment interest and the costs of transcribing the videotaped depositions, and remand for a determination of the fees properly taxed for videotaping the depositions.

I. BACKGROUND

Marion J. Stamps hired Franc Richardson, who represented himself to be a certified public accountant, to represent Stamps in an IRS tax audit in 1979. Richardson later became Stamps' regular accountant. In June 1981, Richardson persuaded Stamps to become a limited partner, to the extent of $62,500, in the purchase of an airplane as a tax shelter.[1] Based on Richardson's recommendation, Stamps also decided to invest an additional $15,000 in a Keogh investment plan that Richardson had previously established, and Stamps gave Richardson a check to cover these two investments (he wrote the check for $82,500 as a result of a mathematical error). Richardson deposited the full amount of the check in the general operating account of his business, Synergistic Financial Services, and used the money for the general operations of the business. Richardson later used money from Synergistic's general operating funds to buy a 421 Cessna aircraft in Stamps' name. Stamps was aware of the purchase of the plane, and even flew in it at one time, but he never inquired as to the details of its ownership—he assumed, as represented at the time of the investment, that he was a limited partner in the plane.

Richardson's attorney prepared papers to register Stamps as a limited partner but neglected to file them. Instead, Richardson made use of Stamps' personal financial information contained in Stamps' business file to persuade CCEC to approve a loan for the purchase of the 421 Cessna aircraft in question. Richardson purchased the aircraft in Stamps' name and testified in his deposition testimony that he considered Stamps a 50 percent general partner with a limited partnership owning the other 50 percent. Richardson further testified that as a result of an error in computer programming, he inadvertently attributed 100 percent of the tax benefits emanating from the airplane to Stamps on Stamps' 1981 and

Stamps acknowledged that he expected no return on his investment aside from tax benefits unless the airplane was sold.

* The Honorable Allen Sharp, Chief Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

1. The aircraft was to be leased to a company of Richardson's that ran a charter service, but

1982 income tax returns as well as to the limited partnership.

Richardson arranged for the purchase of the aircraft through Tumbleson–Payne, a dealer in Alton, Illinois. He represented to Tumbleson–Payne that he was buying the aircraft for Stamps and that he had authority to complete the transaction, including the authority to sign the documents for Stamps. Richardson supplied Stamps' financial information to Tumbleson–Payne, and Tumbleson–Payne, using that information, arranged for financing $481,656 through CCEC's agent, Carson Greene. Richardson also corresponded with CCEC in connection with obtaining the financing.

On September 8, 1981, Greene flew to Alton, Illinois, and met with Richardson, Greene, Bill Tumbleson, Larry Payne and Tumbleson–Payne's secretary, Charlotte Hoorman at the loan closing. Richardson informed the parties that Stamps was out of the state, and since he claimed to be authorized, he advised Bill Tumbleson that he would sign the documents for Stamps.[2] (It was necessary to close the transaction quickly in order to forestall the sale of the plane to another purchaser.) Although neither Greene, Payne nor Hoorman witnessed the signing of the documents, Greene informed Payne and Hoorman that the documents needed their signatures attesting that Stamps had signed the documents in order to be valid. Greene procured their signatures as witnesses to Stamps' signing of the document knowing full well that Stamps was not present for the signing of the loan instruments as required.

Richardson managed the details of operating the airplane, and he leased it to Synergistic Flight Systems, his charter service that was a subsidiary of Synergistic Financial Services. He made 13 payments totalling nearly $113,000 from the general operating account of Synergistic Financial Services, then allowed the loan to go into default.

When CCEC was unable to collect payments from Richardson, it turned to Stamps for recovery. Stamps informed CCEC that the payments were Richardson's responsibility, as Stamps still believed himself to be a limited partner without responsibility for the debt or control over the aircraft. Unable to collect the past-due monies, CCEC repossessed the aircraft on May 5, 1983, and continued in their attempts to acquire payments from Stamps. About that time, Stamps received a copy of the aircraft's security agreement with his name and signature inscribed thereon. Stamps questioned Richardson about the documents, but Richardson claimed he had no knowledge as to who had ascribed his signature to the agreement and further advised Stamps that he (Stamps) was merely a limited partner. On June 7, 1983, Stamps' attorney sent CCEC a letter informing them that Stamps' signature on the document was forged. CCEC ignored the letter and continued to make collection efforts. In November 1983, CCEC informed Stamps that the aircraft had been sold for $250,000 and that he owed a deficiency of $299,000. Stamps' attorney sent CCEC another letter asserting the forgery and informed CCEC that any action to collect the deficiency from Stamps henceforth would be deemed malicious.

On November 15, 1985, CCEC filed a complaint pursuant to 28 U.S.C. § 2201(a) requesting the court for a declarative judgment to determine whether Stamps was liable for the funds loaned for the purchase of the aircraft. CCEC requested that the court find that Stamps had granted CCEC a security interest in the airplane and that Stamps was liable for the $299,000 deficiency. Stamps counterclaimed alleging that CCEC defrauded him of $82,500 and converted it to their own use. He sought compensatory damages of $82,500 as well as punitive damages in the amount of $250,000. The jury rejected CCEC's claim and returned a verdict in favor of Stamps for the $82,500 compensatory damages and $125,000 in punitive damages. The judge awarded Stamps costs of $6,677.44 and pre-

---

**2.** Commercial Credit claims that the documents had already been signed by Stamps four days earlier, but obviously the jury believed otherwise.

judgment interest on the compensatory damages.[3]

Subsequent to the trial court's entry of judgment, CCEC moved for judgement notwithstanding the verdict (JNOV) or, in the alternative, for a new trial. In addition to a number of other errors CCEC assigns to the district court, CCEC appeals the district judge's denial of its motion for JNOV or a new trial.

## II. ISSUES

The issues presented on appeal are whether the district court erred in rejecting CCEC's motion for JNOV or a new trial on the issue of compensatory damages, whether costs of videotaped depositions and transcripts thereof may be taxed as costs, whether punitive damages may be exacted from a party solely on the basis of vicarious liability and whether CCEC's refusal to pay Stamps compensatory damages prior to judgment merited awarding Stamps prejudgment interest.

## III. COMPENSATORY DAMAGES

■ In reviewing a district court's refusal to grant JNOV, we "appl[y] the same standards as the court below...." *F.W. Hempel & Co. v. Metal World, Inc.*, 721 F.2d 610, 613 (7th Cir.1983). In cases governed by Illinois law,[4] "a trial court should enter judgment notwithstanding the verdict 'only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.'" *Id.* (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, 513–14 (1967)). Thus, if there is support for the jury's verdict in the record, we will affirm the trial court's refusal to grant JNOV.

The trial judge submitted the issue of compensatory damages to the jury on the theories of conversion and fraud. The jury returned a general verdict in favor of Stamps in the amount of $82,500. Thus, we must decide whether there was evidence presented to the jury that could support its verdict on either of the theories, conversion or fraud.[5]

### A. Conversion

■ CCEC argues that Stamps' counterclaim of conversion is without support because he failed to demonstrate that CCEC possessed a tangible item of personal property belonging to Stamps. Stamps responds arguing that a specific fund of money may be converted, and that CCEC admitted possessing $82,500 of Stamps' money. Under Illinois conversion law, "the subject of conversion is required to be an identifiable object of property of which the plaintiff was wrongfully deprived. Money may be the subject of conversion, but it must be capable of being described as a specific chattel...." *In re Thebus*, 108 Ill.2d 255, 91 Ill.Dec. 623, 625, 483 N.E.2d 1258, 1260 (1985). In *Eggert v. Weisz*, 839 F.2d 1261 (7th Cir.1988), we refused to allow an action for conversion when an auctioneer sold stamps belonging to a consignor and failed to return the money received in the sale. Citing *Thebus*, this Court held that "Eggert cannot establish a cause of action for conversion ... because Illinois law limits the circumstances in which a plaintiff may maintain an action

---

**3.** The trial court's entry of judgment for prejudgment interest specified neither the interest rate, the duration of the period for which interest was to be assessed nor the amount of interest to be awarded. We have difficulty understanding this open-ended judgment.

**4.** The parties apparently agree that Illinois law controls this diversity action, since both argue Illinois law without discussion of choice of law.

**5.** CCEC argues that even if the trial court's refusal to grant JNOV was proper, the denial of the motion for a new trial was a clear abuse of discretion. "Because 'the authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court,' the grant or denial of a motion for a new trial 'is not subject to review by this court, except upon exceptional circumstances showing a clear abuse of discretion.'" *General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc.*, 695 F.2d 281, 288 (7th Cir.1982) (citations omitted). It is clear from our discussion of conversion and fraud that this case does not present such "exceptional circumstances."

for the conversion of money.... Eggert cannot identify the money owed him as a specific chattel." *Eggert v. Weisz*, 839 F.2d at 1264. Recently in *Sutherland v. O'Malley*, 882 F.2d 1196, 1200 (7th Cir. 1989), we cited *Mid–America Fire & Marine Ins. Co. v. Middleton*, 127 Ill.App.3d 887, 82 Ill.Dec. 555, 559, 468 N.E.2d 1335, 1339 (4th Dist.1984), for the proposition that "[i]n order for money to be the proper subject of a conversion action, ... the plaintiff must have a 'right to a specific fund or specific money in coin or bills.' Where the plaintiff's right is merely to 'an indeterminate sum' of money, a conversion action cannot successfully be maintained." Uncontroverted evidence established that Stamps gave his check for $82,500 to Richardson, his accountant, who in turn deposited it into his general business account. Richardson converted the funds when he made use of the money for the normal operating expenses of his business even though he eventually did apply some of the money as a down payment on the airplane. The down payment, however, went to Tumbleson–Payne rather than CCEC, and no identifiable fund of Stamps' money ever passed to CCEC. The fact that CCEC never received the money would be decisive against Stamps on his conversion claim if there were not a clear admission contained in CCEC's answer to Stamps' counterclaim wherein CCEC admitted receiving $82,500 of Stamps' funds. In denying CCEC's motion for a new trial on Stamps' counterclaim, the district judge found that this admission "provides sufficient support for sustaining the jury's verdict" on conversion.

■ At the close of the defendant's case, CCEC moved to amend its answer (which admitted receiving $82,500 from Stamps) to reflect a general denial of the receipt of Stamps' funds. CCEC contends that the trial judge's denial of its motion constituted an abuse of discretion, as "Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading 'shall be freely given *when justice so requires.*'" (Emphasis added). Given our affirmance of the jury

verdict on the fraud issue, we are not persuaded that justice *required* allowing the amendment, since the ultimate outcome of Stamps' counterclaim would be the same had the district judge allowed the amendment. Thus, the court's rejection of the proposed amendment is insufficient of itself for holding that the district court abused its discretion in refusing to grant CCEC's motion for JNOV or a new trial on the issue of compensatory damages.

### B. Fraud

■ CCEC asserts that Stamps failed to establish that CCEC either participated in any fraud or ratified a fraudulent act of Carson Greene, its agent. Illinois law requires that in an action for fraud, "plaintiff must show a false statement of material fact made by defendant, defendant's knowledge or belief that the statement was false, defendant's intent to induce plaintiff to act, an action by plaintiff in justifiable reliance on that statement, and damage to plaintiff resulting from such reliance." *Marino v. United Bank of Illinois, N.A.*, 137 Ill. App.3d 523, 92 Ill.Dec. 204, 206, 484 N.E.2d 935, 937 (2d Dist.1985) (citations omitted). Under these criteria Richardson clearly defrauded Stamps,[6] (Richardson induced Stamps to invest in a limited partnership that did not exist; Richardson knew the supposed limited partnership was fictional; Richardson intended to induce Stamps to invest in the limited partnership; Stamps acted in justifiable reliance on representations of Richardson, his financial advisor; and Stamps lost his investment as a result of his reliance), but CCEC's involvement in the fraud is less obvious. Nonetheless, Illinois law allows a cause of action for fraud against parties who merely facilitate a fraudulent act by knowingly accepting forged documents. *Instituto Nacional de Commercializacion Agricola (Indeca) v. Continental Ill. Nat'l Bank & Trust Co.*, 530 F.Supp. 279, 281 (N.D.Ill.1982) (the plaintiff "has a cause of action if it can prove that [the defendant] facilitated [the] fraud by knowingly accepting forged documents."); *see also Citizens Savings &*

---

**6.** In his deposition testimony, Richardson admitted defrauding Stamps.

*Loan Ass'n v. Fischer,* 67 Ill.App.2d 315, 323, 214 N.E.2d 612, 616 (5th Dist.1966) ("The rule is that whoever participates in a fraudulent act is guilty of fraud."); *Creighton v. Elgin,* 395 Ill. 87, 103, 69 N.E.2d 501, 509 (1946) ("All those taking part in a fraudulent transaction will be regarded as participants therein...."). There was evidence from which the jury could legitimately conclude that CCEC's agent, Carson Greene, knowingly accepted forged loan documents. Greene was present at the closing of the transaction and knew that Stamps was out of the state; Richardson testified that he took the un-signed documents into an inner office at Tumbleson–Payne and fraudulently affixed Stamps' signature thereto while Greene waited in an outer office; and Greene in-structed Tumbleson–Payne employees to sign as witnesses even though they had not personally witnessed Stamps sign the doc-uments. Viewing this evidence "in its as-pect most favorable to [Stamps]," *Hempel,* 721 F.2d at 613, it is clear the lower court's action in denying CCEC's motion for JNOV on the issue of compensatory damages was proper.[7]

## IV. COSTS

CCEC contends that the trial judge abused his discretion in approving Stamps' bill of costs for photocopying trial doc-uments and for videotaped depositions and transcripts thereof.

### A. Photocopying Costs

■ CCEC argues that the specific doc-uments copied as well as the number of

---

items were inadequately identified. Upon receiving CCEC's challenge to costs in the district court, Stamps' attorney responded with an affidavit describing the documents copied, affirming the number of copies of transcripts (one), the total number of pages copied and the cost per page.

> "It is well settled that the district court has broad discretion when determining whether expenses claimed by the prevail-ing party are taxable as costs. This dis-cretion, however, is not unfettered. In order for the district court to award costs to the prevailing party, the court must determine that the expenses are allowable cost items and that the costs are reasonable, both in amount and ne-cessity to the litigation."

*Weihaupt v. American Medical Ass'n,* 874 F.2d 419, 430 (7th Cir.1989). The trial judge considered CCEC's objections to Stamps' photocopying costs and determined that the copies were allowable, reasonable and necessary to the litigation. He con-cluded that "[a]ll of the objections to the photocopying costs are cured by [the affi-davit of Stamps' attorney]; the affidavit identifies the documents, justifies their use and provides the cost and amount of cop-ies." We do not agree that this finding is an abuse of discretion.

### B. Videotaping Costs

■ CCEC's challenge to the district judge's award of costs for the videotaping and transcribing of depositions, however,

---

**7.** CCEC challenges a number of jury instruc-tions in its appeal. The record reflects that CCEC failed to object to three of these instruc-tions before they were presented to the jury, however, thus waiving its right to appeal them. *See* Fed.R.Civ.P. 51; *Sims v. Mulcahy,* 902 F.2d 524, 535 (7th Cir.1990). The other purportedly erroneous instructions are disposed of, indirect-ly, through our disposition of the issues of con-version, fraud and punitive damages.

The appellant further contends that it was reversible error for the trial judge to refuse to give CCEC's proposed instructions regarding rat-ification of a fraudulent act. The court had previously accepted a more concise statement of the law in one of Stamps' instructions (to which CCEC failed to object), which applied to both parties' claims of ratification against the other.

The trial court is not obligated to give redun-dant instructions; thus the charge that there was reversible error in the refusal to give CCEC's proposed instructions is invalid.

CCEC's assertion that it should get a new trial on its complaint simply because Stamps may have retained some tax benefits from the trans-action, thereby ratifying Richardson's forgery, is without merit. Once this suit was initiated, Stamps could not ascertain whether he is enti-tled to some tax benefits from his original in-vestment until the final disposition of this litiga-tion has determined the extent of his loss. We are not willing to say that retaining tax benefits from an investment (which the IRS allowed) until future events make such benefits invalid through reimbursement of that investment con-stitutes a ratification of a forged signature.

presents a more difficult question. Although several district courts have ruled on costs for videotapes and stenographic transcripts of them,[8] no appellate court has directly addressed the issue.[9] Considering the complexity of today's trials and the extreme demands on judicial manpower and court time, we are of the opinion that it is proper to tax costs for the videotaping of depositions, but not necessarily for the transcripts thereof. Videotaped depositions are a necessary and time effective method of preserving witnesses' time and allocating precious court and judicial time in this age of advanced court technology and over-crowded court calendars. We must not seem reluctant to adopt any and all time-saving methods that serve to improve our system of justice.

Federal Rule of Civil Procedure 54(d) creates a presumption for reimbursing the prevailing party for costs specifically allowed by statute:[10] "Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party. . . ." 28 U.S.C. § 1920(2) allows the court to tax costs of "[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." This provision allows the prevailing party to recover expenses incurred in obtaining necessary transcripts of material depositions, since they are necessary "for use in the case," both for determining what portions of the testimony to present as well as for preparing to impeach witnesses. Federal Rule of Civil Procedure 30(b)(4) provides that "[t]he parties may stipulate in writing or the court may upon motion order that the testimony at a deposition be recorded by other than stenographic means." A videotaped deposition qualifies as "other than stenographic means," and as such is taxable as a substitute for a stenographic transcript,

**8.** See, e.g., Molnar v. Elgin, Joliet & E. Ry. Co., 697 F.Supp. 306, 312 (N.D.Ill.1988) ("a transcript is necessary so that an attorney may decide which portions of the videotape to present to the jury."); Jamison v. Cooper, 111 F.R.D. 350, 352 (N.D.Ga.1986) (costs allowed for videotaping, but not for transcripts thereof on basis of Rule 30(b)(4)); Sack v. Carnegie Mellon University, 106 F.R.D. 561, 564 (W.D.Pa.1985) (costs allowed for videotaping, but not for transcript because the transcript was merely for the convenience of the attorney); Fressell v. AT & T Technologies, Inc., 103 F.R.D. 111, 116 (N.D.Ga. 1984) (cost of transcript of videotaped deposition allowed, but cost of videotaping the deposition was limited as a variant form of a witness fee to $30 per diem); Mastrapas v. New York Life Ins. Co., 93 F.R.D. 401, 407 (E.D.Mich.1982) (costs of videotaped depositions allowed, as they were necessary to the presentation of the defendant's case).

**9.** Two Circuits have affirmed a district court's refusal to tax costs of videotaped depositions without addressing the propriety of taxing such costs. The Sixth Circuit affirmed a district judge's decision to reject the costs of a videotaped deposition on the grounds that it "was of limited probative value to the jury in view of the other evidence in the case." Newman v. Grand Trunk W.R. Co., 781 F.2d 55, 56 (6th Cir.1985). The Eighth Circuit affirmed a trial judge's decision under Fed.R.Civ.P. 37(c) to disallow the costs of videotaping a deposition that was purportedly required as a result of the defendant's refusal to make an admission; the defendant had a "good reason" within the meaning of Rule 37(c) to resist the admission. Pearce v. General Am. Life Ins. Co., 637 F.2d 536, 544 (8th Cir. 1980).

The Eleventh Circuit may have affirmed an award of fees for videotaped depositions without so stating. In Loughan v. Firestone Tire & Rubber Co., 749 F.2d 1519, 1526 n. 2 (11th Cir.1985), the Court awarded "costs for the rental of video equipment and for the operator's fee for attendance at trial," but failed to specify the purpose of the video equipment.

**10.** Costs other than those specified in the statutes may also be taxed. See Farmer v. Arabian American Oil Co., 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964) ("The discretion given district judges to tax costs should be sparingly exercised with reference to expenses not specifically allowed by statute."). We disagree with the Molnar court's description of the Supreme Court's holding in Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), that "a court may only tax those costs specifically authorized by statute." Molnar, 697 F.Supp. at 311. Rather, in Crawford the Supreme Court merely stated that a general rule such as Rule 54(d) cannot overcome a specific limitation such as the 28 U.S.C. § 1821 per diem witness fee. Crawford, 482 U.S. at 445, 107 S.Ct. at 2499 (" 'Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.' ") (citations omitted).

even though it is more expensive.[11] In the present case, the trial judge ordered the videotaped depositions because he believed that they were necessary for trial. Hence, the expenses incurred in the preparation of the videotapes and the replaying of them at trial[12] were properly taxed to CCEC.

■ We believe that Stamps' contention that the stenographic transcripts of the videotaped depositions were necessary for trial preparation has much merit, but Rule 30(b)(4) requires a party to bear its own expenses for transcripts: "A party may arrange to have a stenographic transcription made at the party's own expense." Thus, Rule 30(b)(4) is an express exception "in these rules" to the general presumption in Rule 54(d) of allowing costs "as of course": *"Except when express provision therefor is made either in a statute of the United States or in these rules,* costs shall be allowed as of course...." (Emphasis added). The language in Rule 30(b)(4) requiring parties to bear their own costs of stenographic transcripts of videotaped depositions seems to remove the discretion in this matter from the courts. Consequently, we do not agree with the trial court and are of the opinion that the district judge committed error when he taxed the costs of transcripts of the videotapes to CCEC. Since Stamps' bill of costs failed to distinguish between fees for the videotapes and the costs of the transcripts, we remand to the district court to determine and withdraw from the judgment the costs of the transcripts of the videotaped depositions.

## V. PUNITIVE DAMAGES

■ The trial judge instructed the jury that it could award punitive damages if it found that CCEC's agent was the proxi-

mate cause, through "willful and wanton conduct," of Stamps' loss. In its verdict the jury awarded punitive damages to Stamps in the amount of $125,000. CCEC argues that the award of punitive damages was inconsistent with the purposes behind them.

The Illinois Supreme Court has held that "the punitive and admonitory justifications for the imposition of punitive damages are sharply diminished in those cases in which liability is imposed vicariously." *Mattyasovszky v. West Towns Bus Co.,* 61 Ill.2d 31, 330 N.E.2d 509, 512 (1975). The Court implied that the justification was especially diminished when, as here, the agent who allegedly caused the harm had already been dismissed from the suit (Greene was dismissed from the counterclaim as part of a negotiated settlement shortly before trial). In its holding the Illinois Supreme Court relied upon the Restatement (Second) of Agency, section 217C (1958), which requires that one of four conditions be met before imposing punitive damages vicariously:

"Punitive damages can properly be awarded against a master or other principal because of an act by an agent *if, but only if:*

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act."

*Id.* (emphasis added). Stamps failed to establish (a) that CCEC authorized Greene's

---

**11.** Ironically, the purpose of allowing depositions to "be recorded by other than stenographic means" was to "facilitate less expensive procedures...." Advisory Committee's Notes to the 1970 Amendments to Rule 30(b)(4). *Cf. Perry v. Mohawk Rubber Co.,* 63 F.R.D. 603, 607 (D.S.C. 1974) (request for videotaped deposition denied because additional cost violated stated purpose of Rule 30(b)(4)); *Tsesmelys v. Dublin Truck Leasing Corp.,* 78 F.R.D. 181, 185 (E.D.Tenn. 1976) (The court required the plaintiff to bear his own expense of videotaping because the

purpose of the videotape was to enhance the method of presenting the deposition to the jury). We note that freely ordering videotaped depositions at the request of one party and the expense of the other undermines the sole stated purpose of Rule 30(b)(4).

**12.** Stamps' bill of costs included $1,091 for "video replay expense." As the district court found this to be reasonable and necessary, we will not disturb his finding.

acts that facilitated the fraud on Stamps, (b) that Greene was unfit for his position, or (c) that Greene was employed in a managerial capacity. Relying on (d), Stamps argues that CCEC ratified Greene's acts through its collection attempts and its institution of this litigation. This argument tracks the district judge's conclusion that "the evidence submitted could easily support the theory that Commercial Credit ratified its agent's wrongful actions when it sought to enforce in court the very documents that it knew were forged." The flaw in this theory is that there is absolutely no evidence in this record demonstrating that CCEC had knowledge of the forgery. When the loan went into default, CCEC was entitled to rely upon the signed documents in its possession as well as its records, which demonstrated that everything was in order. The only alternative would have been to accept Stamps' assertions that the loan documents were forged at face value, which would be ludicrous if it is true, as CCEC claims, that delinquent debtors often claim that loan documents are forged.[13] (If the lender must accept as truthful any allegations of forgery, its business enterprise would be short lived.) CCEC had every reason to rely on its documents and records, which reveal that the closing documents were all in proper order. Thus CCEC's actions in relying on its records were proper, and it was entitled to treat Stamps as the debtor until the fraud was established. Upon Stamps' continuing refusal to pay the loan deficiency and his continuing assertions of forgery, CCEC turned to the courts seeking a declaratory judgment to determine whether in fact Stamps was liable for the loan. We know of no better way to establish the parties' respective responsibilities when the debtor's assertions conflict with the creditor's documents and records. The argument that CCEC should be penalized for its collection efforts or for bringing this action for a declaratory judgment by regarding this litigation as a ratification of a fraudulent act is spurious. Inferring ratification

of fraud from a finance company's collection efforts, when the loan documents turn out to be forged, would place finance corporations in an untenable Catch–22 position whenever a debtor claims that loan documents are false—the finance company would be forced to choose between accepting a loss immediately or risking punitive damages as a result of attempting to enforce what it views as legitimate loan documents.

We are convinced that this is just another instance of where punitive damages are totally unwarranted, and furthermore, Stamps has failed to demonstrate a logical and meritorious reason for the imposition of the same.

"Punitive damages are intended to *punish the wrongdoer and to deter that party, and others, from committing similar acts in the future.* Because of their penal nature, *punitive damages are not favored in the law,* and courts must be cautious in seeing that they are not improperly or unwisely awarded.

\* \* \* \* \* \*

It is vital that each case be carefully assessed in light of the specific facts involved, and the ultimate determination should be governed by the circumstances of each particular case. Moreover, *the underlying purposes of an award of punitive damages must be satisfied.*" *Deal v. Byford,* 127 Ill.2d 192, 130 Ill.Dec. 200, 205, 537 N.E.2d 267, 272 (1989) (citations omitted) (emphasis added). It is unthinkable that a sophisticated finance company like CCEC would have a motivation (and Stamps has suggested none) to knowingly loan money on forged documents. Such a strategy would always result in losses, as here, where CCEC has not only failed to recover its $299,000 deficiency but also has lost an additional $82,500 through this litigation. The mere possibility of incurring such losses is more than adequate to deter any finance company from knowingly accepting forged loan documents. Imposing further punitive damages would

---

**13.** Stamps' attorney provided CCEC with a report from a handwriting expert who claimed that the documents were not signed by Stamps,

but CCEC was nonetheless entitled to have a court determine the validity of the documents.

fail to serve "the underlying purposes of an award of punitive damages." Nor would it be appropriate to impose punitive damages to deter finance companies from seeking declaratory judgments regarding the validity of loan documents. Thus, we hold that the district court erred as a matter of law in allowing the punitive damages issue to go to the jury. "[P]unitive damages are not favored in the law, and courts must be cautious in seeing that they are not improperly or unwisely awarded." *Deal*, 130 Ill.Dec. at 205, 537 N.E.2d at 272. Because the argument that CCEC ratified the fraud when instituting this litigation is totally without merit and so ridiculous, we refuse to waste any more time in this opinion discussing the subject matter raised.

## VI. PREJUDGMENT INTEREST

Our disposition of the punitive damages issue likewise mandates that we reverse the award of prejudgment interest. In granting Stamps' motion for prejudgment interest, the district judge concluded that "[t]he award of punitive damages was based on the malicious conduct of CCEC [in bringing this litigation]. Such a finding is sufficient to support a finding of unreasonable and vexatious delay of payment." *See* Ill.Rev.Stat.1987, ch. 17, ¶ 6402. We disagree with the district court's holding that a lender's good-faith request for a declarative judgment on the status of a loan that the lender properly considered valid could be construed as "malicious conduct." Moreover, we know of no Illinois case holding that the pursuit of such good-faith litigation could constitute an unreasonable or vexatious delay of payment. *Cf. Schulz v. Rockwell Mfg. Co.*, 108 Ill.App.3d 113, 63 Ill.Dec. 867, 873, 438 N.E.2d 1230, 1236 (2d Dist.1982) (litigation not "an unreasonable or vexatious delay"). Thus, the lower court's rationale for the imposition of prejudgment interest on CCEC in its pursuit of a legitimate claim is without a foundation in law. We fail to understand how Stamps can logically argue that it is improper for CCEC to refuse to make a payment resulting from the unauthorized acts of its agent until such time as that liability is established in a court of law. Furthermore, we note that Stamps has failed to cite to us any Illinois precedent authorizing the awarding of prejudgment interest against a party who has legitimately contested its vicarious liability, and we refuse to consider such conduct to be an "unreasonable and vexatious delay of payment."

## VII. CONCLUSION

This case is before us resulting from a master of deception and trickery defrauding the other parties to the litigation. Richardson defrauded Stamps by mis-using his investment (with the help of CCEC's agent), and he defrauded CCEC when he obtained financing for an aircraft through false representations. Both Stamps and CCEC, understandably, would like to, and are entitled to, recover their losses. Richardson is judgment proof, however, so the parties have been relegated to attempting to recover from each other. CCEC cannot recoup its damages from Stamps, for the jury's verdict clearly established that the jury found that the loan documents were forged. On the other hand, Stamps can recover his loss of $82,500 from CCEC, as CCEC's agent facilitated Richardson's misuse of the funds. In regard to punitive damages and prejudgment interest, we decline to follow the reasoning presented and punish CCEC for seeking a declaratory judgment regarding the status of Stamps' alleged account. Further, federal law prohibits taxing the costs of transcripts of videotaped depositions. Thus, both parties must bear some of the loss incurred as a result of Richardson's machinations.

For the foregoing reasons, we affirm the district court's award of $82,500 compensatory damages,[14] reverse the award of punitive damages and prejudgment interest, and remand for a redetermination of costs,

14. We note that the district court granted CCEC's motion to amend the judgment for compensatory damages to reflect the $3,000 that Stamps received from Carson Greene pursuant to a settlement agreement. Thus the actual judgment for compensatory damages against CCEC is $79,500.

excluding the costs of transcripts of the videotaped depositions.